```
                  UNITED STATES MAGISTRATE COURT
                   EASTERN DISTRICT OF VIRGINIA
                         Richmond Division



UNITED STATES OF AMERICA          }
                                  }
v.                                }     Criminal Case No.:
                                  }     3:17 MJ 42
CORNELIUS JOHNSON                 }


                                        August 3, 2017
```

**PARTIAL TRANSCRIPT OF BENCH TRIAL**
**BEFORE THE HONORABLE RODERICK C. YOUNG**
**UNITED STATES MAGISTRATE COURT JUDGE**


APPEARANCES:

Thomas A. Garnett, Esquire
Gabrielle M. Michalak, Esquire
OFFICE OF THE UNITED STATES ATTORNEY
919 East Main Street
Suite 1900
Richmond, Virginia  23219

        Counsel on behalf of the United States


Joseph Camden, Esquire
Laura J. Koenig, Esquire
OFFICE OF THE FEDERAL PUBLIC DEFENDER
701 East Broad Street
Suite 3600
Richmond, Virginia  23219

        Counsel on behalf of the Defendant




                    KRISTA L. HARDING, RMR
                   OFFICIAL COURT REPORTER
                UNITED STATES MAGISTRATE COURT
```

**E X A M I N A T I O N S**

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Nurse Beverly Leedle | 3 | 14 | -- | -- |
| Nurse Lenea Flippen | 32 | 37 | -- | -- |
| Sergeant Almond | 46 | 51 | 54 | -- |

Whereupon, **Beverly Ann Leedle**, having been duly sworn in, testifies as follows:

**DIRECT EXAMINATION**

BY MS. MICHALAK:

Q    Good afternoon.

A    Hello.

Q    Please state your name.

     Okay.

     Please state your name, and spell your last name for the record, please.

A    Beverly Ann Leedle.  L-E-E-D-L-E.

Q    Where are you employed, Ms. Leedle?

A    At Hunter Holmes McGuire VA Medical Center in Richmond.

Q    And how long have you been employed at the hospital?

A    My hire date was August 26, 2001.

Q    How are you employed?

A    I'm a registered nurse.

Q    Let's talk about what happened on January 30, 2017. Were you working on that day?

A    Yes.

Q    Tell me about the details of your shift.  What floor were you assigned to?

A    Floor C.

Q    And do you typically work alone?

DIRECT EXAMINATION OF MS. LEEDLE, RN BY MS. MICHALAK    4

A    We normally work in teams or pairs.  We're never really truly alone.

Q    Who were you working with that day?

A    Lenea Flippen.

Q    On January 30th, when you were working with Ms. Flippen, were you -- were you -- did you go into Room 4C-123?

A    Yes, ma'am.

Q    And how many patients were receiving care in Room 4C-123?

A    One.

Q    Do you recognize the patient who was being treated in Room 4C-123?

A    Yes, ma'am.

Q    Can you please identify him by an item of his clothing?

A    The gentleman in the gray striped shirt.

        MS. MICHALAK:  Let the record reflect that Ms. Leedle has identified the patient who is receiving treatment in Room 4C-123, for the record.

        THE COURT:  Okay.  It will so reflect.

BY MS. MICHALAK:

Q    Did anything happen to you in Room 4C-123 on January 30, 2017?

A    My head was banged against the wall violently.

Q    Okay.  Let's -- let's talk about how that happened.  Where did you first see the defendant?

A    He was in the hallway with a food tray.

Q    Was he supposed to have that food tray?

A    No, ma'am.

Q    What happened next?

A    He put the -- he took the food tray into his room, and I followed him in there with the attempt to get the tray away.

Q    Did you say anything to him?

A    I -- I cannot remember in exact words.  But they were to the effect that he could not have that tray and he needed to let it go.

Q    Did you take the food tray from him?

A    No.  I called Ms. Flippen and she took it after I got -- after I talked Mr. Johnson into letting it go.

Q    And then what happened next?

A    He -- as I was leaving the room, he grabbed me and banged my head against the wall.

Q    How many times did he bang your head against the wall?

A    Between three to five.  I'm not exactly sure.

Q    And how hard did he bang your head?

A    Hard enough that it hurt.

Q    Were you saying anything while he was assaulting you?

A    I am not exactly sure.  My memory's really foggy.  I definitely would have asked for assistance and requested a Dr. Atlas to be called.

Q    What's a Dr. Atlas?

A    That is a call for other staff members to respond to a situation.

Q    And did anyone else enter the room after you called Dr. Atlas?

A    I'm not sure.

Q    Okay.  Ms. Leedle, did you seek medical treatment after this happened?

A    Yes, ma'am.  I went downstairs to the emergency room.

Q    And let's talk specifically about the injuries that you received.  Can you tell us a little bit about the injury to your head?

        MR. CAMDEN:  Objection.  Relevance, Your Honor.  This is a simple assault.  There's no injury (inaudible) or even an intent to injure.

        THE COURT:  Overruled.  Go ahead.

BY MS. MICHALAK:

Q    Was there a bruise to your head when -- after the defendant assaulted you?

A    I was told there was.

        MR. CAMDEN:  Objection.  Hearsay.  Confrontation clause.

THE COURT:  Response?

MS. MICHALAK:  I'll -- I'll rephrase.

THE COURT:  All right.

BY MS. MICHALAK:

Q    Did you -- after the injury to your head, did -- did you experience -- what symptoms did you experience to your head after -- in the immediate aftermath of the assault?

A    I became extremely nauseous.  I had problems with my vision.  I didn't know what words to say.  My head was -- like I could see the words in my head, but I couldn't say them.  I felt like I was going to fall down.

Q    Okay.  And the symptoms that you just described, in your opinion, what -- what is that consistent with?

MR. CAMDEN:  Your Honor, I'm sorry.  If I could just have a standing objection to the line of questioning regarding the injury and the (inaudible) so I don't have to interject?

THE COURT:  Certainly.

MR. CAMDEN:  Thank you, Your Honor.

THE COURT:  Go ahead.

MS. MICHALAK:  I'm sorry.  Is that overruled?

THE COURT:  That's -- the objection is overruled.

MS. MICHALAK:  Okay.

THE COURT:  You can ask the question.

MS. MICHALAK:  Okay.

BY MS. MICHALAK:

Q    In your opinion, the symptoms that you just described, that's consistent with what type of injury?

MR. CAMDEN:  Objection.  I think this calls for expert testimony and speculation.

THE COURT:  Sustained.

BY MS. MICHALAK:

Q    Are you still --

THE COURT:  That's what I thought you were going to object to the first time you stood up.

But go ahead.

MR. CAMDEN:  (Inaudible).

THE COURT:  That objection is sustained.

MS. MICHALAK:  Okay.

THE COURT:  All right.

BY MS. MICHALAK:

Q    Are you still experiencing any of the symptoms that you just mentioned today?

A    Yes.

Q    Let's talk a little bit about the injury to your back, Ms. Leedle.  I'd like to show you what has been marked as Government's Exhibit 1.

Ms. Leedle, do you recognize this photograph?

A    Yes.

Q    What is it?

A    That's a picture that was taken of my back in the emergency room.

        MR. CAMDEN:  Objection.  Personal knowledge, lack of foundation.

        THE COURT:  All right.  Ask some additional questions.  The objection is sustained.  Ask some additional questions.

        MS. MICHALAK:  Okay.

BY MS. MICHALAK:

Q    This -- this photograph, do you recognize the person in this photograph?

A    Yes.

Q    Who is it?

A    Me.

Q    And do you recognize the injuries on this photograph?

A    Yes.

Q    Is it --

        MR. CAMDEN:  Again, objection.  Personal knowledge, lack of foundation and confrontation clause.

        THE COURT:  Well, she's asking the questions.  It's a -- she hasn't moved it into evidence, so that's overruled at this time.

        MR. CAMDEN:  Understood, Your Honor.

BY MS. MICHALAK:

Q    Does this photograph fairly and accurately show the injuries that you suffered to your back when the defendant assaulted you?

MR. CAMDEN:  I think at this point I do have to object to lack of foundation, just personal knowledge. These are injuries -- the basis of the objection, Your Honor, these are injuries on the back, and nobody can see their own back.  And this photograph, obviously, if it shows her, it wasn't taken by her.  There is no way she can authenticate that --

THE COURT:  Right.  Yeah, that's overruled.

All right.  Okay.  Go ahead.

BY MS. MICHALAK:

Q    Does this photo fairly and accurately show the injuries to your back immediately after the defendant assaulted you?

A    Yes.

MS. MICHALAK:  Your Honor, I'd move that Government's Exhibit 1 be introduced into evidence.

THE COURT:  All right.

MR. CAMDEN:  Same objection I made, Your Honor. Lack of foundation, confrontation clause.  *Melendez Diaz* is the Supreme Court case where they're requiring the person who filed to authenticate the exhibit.  In that case, it was drug tests.  That that person be present in

Case 3:17-cr-00136-HEH   Document 31   Filed 10/21/17   Page 11 of 74 PageID# 136

DIRECT EXAMINATION OF MS. LEEDLE, RN BY MS. MICHALAK   11

court and subject to cross-examination.  So hearsay, lack of foundation and confrontation clause are the grounds.

THE COURT:  Right.  But the -- the standard for introducing a photograph is does it fairly and accurately represent what was taken at the time.  And I think she's laid the -- the foundation for that.  And so on that basis, it's overruled and it will be accepted.

(Government's Exhibit 1 is received.)

MR. CAMDEN:  Yes, Your Honor.

When I -- when I do cross, could I do a little bit of voir dire on that just --

THE COURT:  Sure.  Sure.

BY MS. MICHALAK:

Q    Ms. Leedle, were these scratches the result of the defendant putting his hands on you?

A    Yes.

Q    And when you first walked into work that morning, did you have any marks on your back?

MR. CAMDEN:  Objection.  Relevance.  The charge in this case is the head banging against the wall and not for any scratches on the head.

MS. MICHALAK:  Your Honor, we're trying to show all of the injuries that Ms. Leedle sustained from this attack.  It was both an injury to her head and scratches to her back.  And this goes to show that she sustained

injuries to her back as a direct result of the -- of the assault from the defendant.

THE COURT:  All right.

Mr. Camden?

MR. CAMDEN:  Yes, Your Honor.  The information in this case, if you look at it specifically, alleges only that he committed an assault by striking -- here, I'm quoting.  This is Count 1.  "Did commit a simple assault on a VA Medical Center employee by striking that employee's head into a wall several times."

THE COURT:  All right.

What do you have to say to that?

MS. MICHALAK:  Mr. Camden just argued that the injuries weren't relevant, but now he's arguing they are relevant.  We can't have it both ways.  Is it relevant or irrelevant?

MR. CAMDEN:  All irrelevant.  The injuries --

THE COURT:  Just -- just a second.

So a couple of things.  The first thing he's arguing, I think, is that in your charging document you said injuries to her head, right?

MS. MICHALAK:  Yes.

THE COURT:  So how do injuries to her back play into the injuries to her head?  What's charged in your charging instrument?

MS. MICHALAK:  One -- one moment, Your Honor.

Your Honor, we charged an assault in this case. And so the injury to her back is an additional -- is additional evidence of the assault to Ms. Leedle, making it more likely that the assault to her head happened in the first place.

THE COURT:  Hold on.

Well, you say "committed simple assault by striking the employee's head into the wall several times," is that right?

MS. MICHALAK:  That's correct, Your Honor.

THE COURT:  All right.  Okay.  So his objection's sustained.

MS. MICHALAK:  Okay.

BY MS. MICHALAK:

Q   Ms. Leedle, is there any doubt in your mind that the defendant grabbed you and banged your head into the wall?

MR. CAMDEN:  Objection.  Speculation.  Calls for an opinion.

THE COURT:  A response?

MS. MICHALAK:  Your Honor, we're talking about the injury that she received to her head.  I'm just asking whether or not there's any doubt in her mind about it.

THE COURT:  That Mr. Johnson was the one who caused that injury?

MS. MICHALAK:  Correct.

THE COURT:  So that -- that objection's overruled.  You may answer that question.

A    Mr. Johnson did it.

MS. MICHALAK:  Thank you.  No further questions.

THE COURT:  Okay.  All right.

Any cross-examination?

MR. CAMDEN:  Yes, Your Honor.

Well, first, I didn't ask before.  The exhibit, the photograph that was actually admitted, we don't have any argument with Ms. Leedle, but if the Court feels it appropriate to seal that, we wouldn't have any objection to that.

THE COURT:  All right.  It's not.

MR. CAMDEN:  It's private information.

THE COURT:  Since we're only dealing with the head, it's not even in.

MR. CAMDEN:  Understood, Your Honor.

THE COURT:  I'm going to withdraw it from evidence, for lack of a better term.

Is there any objection from the United States?

MR. GARNETT:  That's fine, Your Honor.

THE COURT:  All right.  Very good.

**CROSS-EXAMINATION**

BY MR. CAMDEN:

Q    How should I address you, first?  Is it Nurse Leedle, Ms. Leedle?  How would you prefer?

A    Whatever you choose.

Q    Okay.  So, Ms. Leedle, you said that you first saw Mr. Johnson here when he was in the hallway, correct?

A    That -- yes.

Q    Okay.  How far from his room was he at that point?

A    I cannot give you an accurate answer.

Q    If you were to estimate, 10 feet, 20 feet, was he right outside the door?

A    He was at least two patient rooms down.

Q    Okay.  That's fine.  It doesn't have to be exact. I'm just trying to get an approximate idea.

     And he was carrying a food tray?

A    Yes.

Q    Okay.  Are these food trays covered or open?

A    He took it off the cart where the food trays are delivered on.

Q    Right.  Is it open or is it covered?  I mean, is there a cover on the food, or is it just an open food tray like you'd have at a cafeteria?

A    Some of the food on the cart is covered.  The rest of it is not.  I do not understand why you're asking.

Q    Don't worry about why.  I'm just going to ask simple factual questions.

CROSS-EXAMINATION OF MS. LEEDLE BY MR. CAMDEN    16

THE COURT:  You don't need to argue with her. Just ask your next question.

BY MR. CAMDEN:

Q    Food trays are distributed three times a day on the 4th floor, correct?

A    Yes.

Q    First, the breakfast is it 7:00 a.m., right?

MS. MICHALAK:  Objection.

THE COURT:  All right.

MS. MICHALAK:  Relevance, Your Honor.  What -- what is the basis for inquiring as to the number of times a food tray is delivered to patients?

THE COURT:  All right.

Mr. Camden?

MR. CAMDEN:  Yes, Your Honor.  This incident happened at 12:40 p.m.  The initial was at 7:00 a.m.  They have said that he was told he couldn't eat.  And I'm going to get into why he couldn't eat in a couple minutes.  But the idea here is to establish that it had been five and a half hours, that he had no other source of --

THE COURT:  Let's just get directly to that.

MR. CAMDEN:  Okay.

THE COURT:  All right.

BY MR. CAMDEN:

Q    You said that he wasn't supposed to eat?

CROSS-EXAMINATION OF MS. LEEDLE BY MR. CAMDEN    17

A     Yes.

Q     Why wasn't he supposed to eat?

A     The doctors had said he should not eat for tests.

Q     So he was scheduled to have a medical procedure done?

A     To the best of my knowledge.

Q     Okay.  And you do need to be familiar with the treatment your patients are receiving, correct, to do your job as a nurse?

A     Yes.  I --

Q     So was it an MRI that he was going to have?

            MS. MICHALAK:  Objection, Your Honor. Speculation.

            THE COURT:  Mr. Camden?

            MR. CAMDEN:  Well, she can say whether she knows or not, Your Honor.  It's her job to be familiar with her patient's treatment.

            THE COURT:  So ask her if she knows what he was going to have.

BY MR. CAMDEN:

Q     Do you know if he was going to have -- what treatment he was going to have?

A     He was Ms. Flippen's patient.  I was another nurse on the floor.

Q     Okay.  So after you saw him, he went into his room with the food tray, right?

A    Yes.

Q    Okay.  You followed him into his room?

A    Yes.

Q    And he is the only patient in this room, correct?

A    Yes.

Q    And that's where he sleeps?

A    Yes.

Q    And that's where he keeps his things, right?

A    Yes.

Q    And that's where he changes clothes?

A    Yes.

Q    And that's -- there's a door to this room, correct?

A    Yes.

Q    Okay.  And when you followed him into his room, you didn't stop at the entrance and ask for permission to come in, did you?

A    I honestly do not remember.

Q    You didn't knock on the door, no?

A    I honestly do not remember.

Q    Would you remember if you had knocked?

A    No.

Q    Would you remember if you'd asked him permission to come in his room?

A    No.

Q    But you don't remember him ever giving you permission

to come in his room, do you?

A     No.

Q     Okay.  Was there any mention while you were in the room trying to get the tray back of calling the police?

A     I do not remember, sir.

Q     Either by -- we're not asking -- let me clarify.  Did either you or Nurse Flippen, or any other medical staff that were in the room, mention the police?

A     I do not accurately remember, sir.

Q     Okay.  Well, it's now August and this happened January 30th, correct?

A     Yes.

Q     Okay.  So it's been about seven months?

A     Yes.

Q     Okay.  An investigator from the federal defenders contacted you about a month or two ago, correct?

A     Yes.

Q     And asked to speak with you about what had happened that day, correct?

A     Yes.  I was unsure where he came from.

Q     He showed you his card, right?

A     Yes.

Q     And he told you that he worked for the federal defenders and that we represent Cornelius Johnson, didn't he?

A    He told me he worked for the federal defenders.

Q    Okay.

A    I do not ever remember him saying Cornelius Johnson's name.

Q    But he asked you -- well, he asked you if he could speak about what happened on January 30th, right?

A    Yes.  And I told him I could not because of the federal laws protecting patient confidentiality.

Q    And you know that Mr. Cornelius Johnson had submitted a signed waiver of HIPAA rights to the VA?

A    No.

Q    You didn't know that?

A    No.

Q    Did you check his file?

A    I am not allowed to check his file because that would be a violation of patient confidentiality.

Q    Well, did you check with the records department about whether he waived that confidentiality?

A    That would be a violation of patient confidentiality to even access his records.

Q    To ask whether it had been waived?

A    Yes, sir.

Q    Okay.  So anyway, at the end of that conversation you declined to speak with the investigator about what had happened that day?

A     Yes.  And took him several different places because I did not understand why he was approaching me at work and why he'd been to my house.

Q     Ms. Leedle, you did speak with the prosecutor about this case, right?

A     On the day I received the subpoena.

Q     You spoke with them about -- on the day you received the subpoena, and when you came to the courthouse today at about 12:30, right?

A     Correct.

Q     And you met with the prosecutors again --

          MS. MICHALAK:  Objection, Your Honor.

          THE COURT:  Just a minute.

          What's the objection?

          MS. MICHALAK:  Relevance.

          THE COURT:  What's the --

          MR. CAMDEN:  Bias, Your Honor.

          THE COURT:  Response?

          I don't see what the bias is just yet, but let's -- I'm going to overrule your objection for right now.

BY MR. CAMDEN:

Q     So today is the first chance that we've had to talk about what happened that day, correct?

A     Yes.

Q    Okay.  Let's talk a little bit more about the 4th floor.  The 4th floor of the hospital is psychiatric patients only, correct?

A    No.

Q    Does it have a -- is there a section that is devoted entirely or just to psychiatric patients?

A    Please be more specific.

Q    The area of 4C-123 is his room, correct?

A    Yes.

Q    Okay.  And was that room devoted to patients who have psychiatric problems?

A    I do not remember to correctly answer your question.

Q    Okay.  So it wouldn't be accurate to refer to the 4th floor as the psych ward or the psychiatric ward?

A    No.

Q    Okay.  All right.  As you're doing your rounds, you do have to review the medical charts of the patients, correct?

          THE COURT:  She has to review what?  I'm sorry.

          MR. CAMDEN:  Medical charts.

          THE COURT:  Medical charts.  All right.

A    Only to the extent that it would be appropriate for their care.

Q    Exactly.  Right.  You have to check prescriptions the doctors ordered, for example?

A     Again, he was not my direct patient.  He was Ms. Flippen's direct patient.  I was another nurse on the floor who was assisting Ms. Flippen with this.

Q     Okay.  So how did you know when you first saw him with the food tray that he wasn't allowed to eat?

A     Ms. Flippen and I had spoke with him, to the best of my knowledge.

Q     Spoken with whom?  With each other or with Mr. Johnson?

A     As you yourself said, it's been several months.  I cannot give you an answer directly.  But I know I spoke with Ms. Flippen.

Q     Okay.  Do you know that he'd been -- at the time this happened, he'd been in the hospital for about four days, correct?

A     I do not have an accurate answer.

Q     You knew at least that he was exhibit -- he has mental confusion and seizures?

A     I cannot give you an accurate answer.  It's been six months.

Q     Okay.  Is that from lack of memory --

A     Plus, he wasn't my direct patient, so I would not have -- not gone into his records because that would be a violation of HIPAA.

Q     Okay.  So let's get back -- actually, let's talk

CROSS-EXAMINATION OF MS. LEEDLE BY MR. CAMDEN    24

about the room.  It's 4C-123.  How big is this room?

A    I have never measured the room.  I would not know.

Q    You've been in the room though, right?

A    Yes.

Q    Okay.  Well, we don't need down to the inch.  We're just looking for –

THE COURT:  Just ask her a question.

BY MR. CAMDEN:

Q    – an estimate of how big the room was.  Estimate.

A    I cannot give you an accurate answer.

Q    Was it bigger than this courtroom or smaller?

A    Smaller.

Q    Okay.  Was it -- is one wall from where I'm standing to the wall behind you, or shorter?

A    It would be shorter, but the perspective is going to be different.

Q    Okay.

MR. CAMDEN:  Your Honor, if I could leave the podium just to illustrate some distances?

THE COURT:  Yes.

BY MR. CAMDEN:

Q    So, if you're looking at the distance between the podium and the beginning of the witness stand, is it about that wide?

A    I cannot give you an accurate answer because the

CROSS-EXAMINATION OF MS. LEEDLE BY MR. CAMDEN   25

spaces are totally different.

Q    What do you mean by "the spaces are totally different"?

A    This has a very high ceiling.

Q    So you're saying you have no idea how big the room was?

THE COURT:  I think you've exhausted this line of questioning.

MR. CAMDEN:  Yes, Your Honor.

BY MR. CAMDEN:

Q    Let's talk about what's in the room.  There's a hospital bed, correct?

A    Yes.

Q    And the hospital bed is away from the wall, correct?

A    Yes.

Q    Okay.  And that's so that people can get in --

MS. MICHALAK:  Objection, Your Honor.  Relevance.

MR. CAMDEN:  We need to figure out --

THE COURT:  Just -- just --

So relevance as to the hospital bed question?

MS. MICHALAK:  As to where this is even going.

THE COURT:  Okay.  Just a second.

All right.  Go ahead, Mr. Camden.

MR. CAMDEN:  Your Honor, I'm trying to figure

CROSS-EXAMINATION OF MS. LEEDLE BY MR. CAMDEN    26

out who's located in what position when this assault starts.

THE COURT:  I figured that much.

Objection overruled.

BY MR. CAMDEN:

Q   So there's a hospital bed?  When you walk into the room, are there any windows?

A   In the room, correct.

Q   Okay.  How many windows?

A   I have never counted the windows, sir.

THE COURT:  Relevance on how many windows are in the room, Mr. Camden.

BY MR. CAMDEN:

Q   Is the wall -- is the door to the room in the middle of the wall or on one end?

A   On one end, sir.

Q   Okay.  How many chairs are in the room?

A   I do not accurately remember, sir.

MS. MICHALAK:  Relevance, Your Honor.

MR. CAMDEN:  Your Honor, here's the story.

THE COURT:  I understand what you're trying to do.  You just need to move it along a little bit.  There's a bed in the room, how many chairs are in the room, (inaudible) and bear to any relation when whatever happened with Mr. Johnson, if anything.

MR. CAMDEN:  I was -- actually, what I would like to do, Your Honor, I've got a blank piece of paper. If I could have her diagram the room and where people are standing.  I'd just ask her to do that.

MS. MICHALAK:  Relevance, Your Honor.  Why -- why do we have to go through the diagram if we can just establish it?

MR. CAMDEN:  They haven't established it.

THE COURT:  Right.

I think he can establish it.  I don't know that we need a diagram per se, but I think we can establish where people were.  But, you know, for the purposes, I will allow her to, if she thinks she can do it, draw a diagram of the room and where people were standing when the incident took place.

BY MR. CAMDEN:

Q   If I give you a blank piece of paper, would you be able to draw a diagram of where people were standing at the time this all happened?

A    No.

Q   Is that because you don't remember?

A    Yes.

Q   When you walked into the room following him with the food tray, where was he when you got into the room?

A    Next to his bed.

CROSS-EXAMINATION OF MS. LEEDLE BY MR. CAMDEN    28

Q    On the side closest to the door or away from the door?

A    Away from the door, sir.

Q    Okay.  So the bed was between him and the door?

A    Yes, sir.

Q    Okay.  And what did you do when you got into the room?

A    I walked around to where he was.  He knew I was in the room.

Q    Okay.  What did you say then?

A    I honestly do not remember, sir.

Q    You don't remember at all what you said?

A    Not to where I can say accurately without falsifying if possible.  I have no idea, sir.  My head is very scrambled.

Q    Okay.  You were able to view yourself in the mirror, correct, after the injuries?

A    Yes.

Q    Or after the assault happened?  You didn't see any sort of bruising on your head.

A    I have hair, sir.

Q    Are you able to part your hair?

A    Yes, I can part my hair.

Q    Okay.  Did you do that?

A    Attempting, yes.  Did I see something?  No.

Q     Okay.

A     But bruises are not always on the exterior.

Q     Okay.  Have you applied for disability as a result of your injuries?

A     I am attempting to go through the paperwork, sir.

Q     Okay.  Have you received any benefits so far?

A     No, sir.

Q     Have you received anything independent of that from, for example, the union, or anyone else, as a result of your injuries?

          MS. MICHALAK:  Objection.  Relevance.

          MR. CAMDEN:  This is direct bias, Your Honor.

          THE COURT:  And what's the bias?

          MR. CAMDEN:  It's an incentive, Your Honor.

          THE COURT:  All right.

          MR. CAMDEN:  It's a financial incentive to discuss the injury.

          THE COURT:  I'll -- I'll allow it.  Just reask the question.

BY MR. CAMDEN:

Q     Have you received any sort of compensation as a result of the injuries from any source?

A     No.

Q     Okay.  Not yet, correct?

A     I don't know the future.

CROSS-EXAMINATION OF MS. LEEDLE BY MR. CAMDEN     30

THE COURT:  I think that answer is no.

Next question.

MR. CAMDEN:  Got it.

BY MR. CAMDEN:

Q    So at the time the assault happened, you say that Mr. Johnson grabbed you and banged your head against the wall, correct?

A    Yes.

Q    All right.  How did he grab you?  Was it around your arms or was it around your -- by your head?

A    I cannot accurately answer you, sir, to say definitively this is how he grabbed me.  I would give you a -- I believe he grabbed me around the waist.

Q    And it was by moving your waist that he made your head contact the wall?

A    To the best of my knowledge.

Q    Okay.

MR. CAMDEN:  No further questions, Your Honor.

THE COURT:  All right.

Government, any redirect?

MS. MICHALAK:  None from the government, Your Honor.

THE COURT:  All right.  I have one question.

Ma'am, do you remember how many times your head hit the wall?

MS. LEEDLE:  Somewhere between three and five, sir.  I do not remember.

THE COURT:  All right.

Based on that question, does that engender anymore cross-examination from you, Mr. Camden, on that question?

MR. CAMDEN:  Very briefly.

BY MR. CAMDEN:

Q    So you would -- and you would come around the bed to see him, or to get close to him, right, when he was on the other side of the bed?  So at the time he grabbed you, how close were you to the wall?

THE COURT:  Did you have any cross-examination on the fact that she said her head hit the wall three to five times?

MR. CAMDEN:  Right.  So I'm trying to get how close are the walls.  Is this swinging far or is this immediate contact.  But I'll -- I'll withdraw the question.

THE COURT:  All right.

Does that engender any questions from you based on my question?

MS. MICHALAK:  No, Your Honor.

THE COURT:  All right, ma'am.  Thank you.  You may step down.

DIRECT EXAMINATION OF MS. FLIPPEN BY MS. MICHALAK   32

**WITNESS STOOD ASIDE**

THE COURT:  May she be excused?

MS. MICHALAK:  Yes, Your Honor.

THE COURT:  All right.

MR. CAMDEN:  Yeah.  No objection, Your Honor.

THE COURT:  All right.

All right, ma'am, you may be excused.  You may remain in the courtroom if you like, or you may be excused.

MS. MICHALAK:  Your Honor, the government calls Nurse Lenea Flippen.

THE COURT:  All right.

THE CLERK:  Do you affirm under penalty of perjury that the testimony you're about to give, in this case, before this Court, shall be the truth, the whole truth, and nothing but the truth?

MS. FLIPPEN:  Yes.

Whereupon, **Lenea Flippen**, having been duly sworn in, testifies as follows:

**DIRECT EXAMINATION**

BY MS. MICHALAK:

Q    Good afternoon.

A    Hi.

Q    Please state your name, and spell your last name for the record, please.

A       Lenea Flippen.   Last name is F-L-I-P-P-E-N.

Q       Where are you employed?

A       The McGuire VA hospital.

Q       How long have you been employed by the hospital?

A       A little bit over 12 years.

Q       How are you employed?

A       I'm a nurse.

Q       Were you working on January 30th, 2017?

A       Yes.

Q       And what floor were you assigned to that day?

A       Med/surg oncology, 4th floor.

Q       Okay.   And --

        THE COURT:   What's the name of the floor?   I'm sorry.

        MS. FLIPPEN:   Med/surg oncology.

        THE COURT:   Med/surg oncology.   Okay.

BY MS. MICHALAK:

Q    Is Room 4C-123, was that part of your assigned coverage area?

A       Yes.

Q    And how many patients were receiving care in Room 4C-123 on that day?

A       One.

Q    Who was in Room 4C-123?

A       Mr. Johnson.

DIRECT EXAMINATION OF MS. FLIPPEN BY MS. MICHALAK   34

Q    Do you recognize Mr. Johnson in the courtroom this afternoon?

A    Yes.

Q    Can you please identify him by identifying him by an item of his clothing?

A    The gray shirt on.  The gray, I guess you'd call it, with the pocket on it.

Q    Okay.

        MS. MICHALAK:  Let the record reflect that Ms. Flippen --

        THE COURT:  It will so reflect.

        MS. MICHALAK:  Thank you, Your Honor.

BY MS. MICHALAK:

Q    Let's talk about what happened in Room 4C-123 on January 30, 2017.  Where did you first see the defendant?

A    In his room.

Q    And what was the defendant doing?

A    I was making first rounds, so he was pretty much in his bed.

Q    Okay.  What happened -- what happened next?

A    Throughout the day he was agitated.  He wanted to go home.  He wanted to eat.  He was scheduled for tests, so he couldn't eat.  Like around about lunchtime, he got out of the room and managed to get a tray off the cart in the hall.

Q    Was he supposed to be in the hallway?

A    No.

Q    And after taking the tray where did he go?

A    Back to his room.

Q    When he went into his room, what did you do?

A    I went into his room and I stood at the door just to remind him that, you know, he's not supposed to eat.  If he eats, he can't get the test and he can't go home.

Q    And where was Ms. Leedle?

A    She came around me.  She went into the room around me.

Q    And what did she do then?

A    She tried to get the tray.

Q    And were -- was she able to get the tray?

A    No.  He turned around and grabbed her.

Q    So Mr. Johnson grabbed Ms. Leedle?

A    Yes.

Q    And where was the tray?

A    The tray was on the table in between them and the side table on the other side of the bed.

Q    What happened to the tray after Mr. Johnson grabbed Ms. Leedle?

A    I reached across the bed and got the tray and took it out the room.

Q    Okay.  And why did you grab the tray?

A    Because it had like utensils and a metal heating tray, and I didn't want him to turn around and pick it up and try to use it.

Q    Use it against?

A    Ms. -- like to hit her, or something like that.

Q    Okay.  And so during this whole exchange, you saw Mr. Johnson grab Ms. Leedle, is that correct?

A    Yes.

MS. MICHALAK:  One -- one minute, Your Honor.

THE COURT:  All right.

BY MS. MICHALAK:

Q    And one last thing.  How long did Mr. Johnson have Ms. Leedle by the arms?

A    After I grabbed the tray, I didn't know.  Once I seen him grab her and push her up against the wall, I got out the room.  So I didn't see anything after this.

Q    Okay.  When you saw him -- so you saw him push her against the wall?

THE COURT:  You have to say yes or no, ma'am.

MS. FLIPPEN:  Yes.

THE COURT:  All right.

MS. MICHALAK:  Thank you.  No further questions.

THE COURT:  All right.

Mr. Camden.

**CROSS-EXAMINATION**

CROSS-EXAMINATION OF MS. FLIPPEN BY MR. CAMDEN        37

BY MR. CAMDEN:

Q    How should I address you?  Ms. Flippen or Nurse Flippen; how would you prefer?

A    Whatever you want.

Q    Okay.  Ms. Flippen, so nurses -- at least that day you were working in pairs, correct, you and Nurse Leedle?

A    We -- what do you mean by "pairs"?  Like -- because usually our assignment we're assigned so many rooms, so many patients.

Q    Uh-huh.

A    On 4C, it's two nurses at all times.

Q    Uh-huh.

A    So I have my set of patients, she has her set of patients.

Q    Oh, okay.  And Mr. Johnson was one of your patients?

A    Mr. Johnson was my patient.

Q    And so you were familiar with his medical history?

A    Uh-huh.

Q    He'd been there about four days at that point?

A    Well, a little bit, yeah, like four days.

Q    Okay.  And after this all happened, he stayed in the hospital for another week or so, right?

A    I'm not quite sure.  Like we don't keep the same set of patients.

Q    Oh, you don't keep the same set of patients.  So it's

day-to-day.  It's different?

A    It's like so if I'm assigned to that unit and I'm there for like three days, he might be my patient for three days.  But once I'm off, he kind of switches over to a whole other nurse.

Q    Okay.  Got it.  Just one second.

So food trays are distributed three times a day, right?

A    Uh-huh.

Q    Breakfast is 7:00 a.m., right?

A    6:30.

Q    6:30.  Okay.  And this happened about 12:40?

A    Something like that.  Breakfast -- lunch is at 11:30.

Q    Okay.

A    So a little bit after that is when he got the tray because it was after they passed out the trays.

Q    Right.  And if you're looking at him -- Mr. Johnson sitting here right now, he was about the same weight then as he is right now, right?

A    I guessing so.

Q    Okay.

A    Uh-huh.

Q    Is it to the best of your memory?

A    To the best of my memory.

Q    Okay.

And when you went to the room, did you follow -- or sorry.  After you saw him go into his room with the tray, Nurse Leedle went in first, right?

A    No.

Q    No?  You went in first?

A    I went in first.

Q    Okay.  Where did you -- where did you stand?

A    In between the door -- well, if I had -- I could draw the room for you.  But it's the door, I stood right there, then the bed and then the wall.

Q    Let's -- actually, we're going to take you up on that.

MR. CAMDEN:  If I could, Your Honor?

THE COURT:  Sure.

MR. CAMDEN:  Sorry.  I'm going to premark this paper as Defense Exhibit -- are we 1?  Are we numbers or letters?

THE COURT:  Say A.

MR. CAMDEN:  A?

THE COURT:  Yes.

Any objection?

MS. MICHALAK:  No objection, Your Honor.

All right.

BY MR. CAMDEN:

Q    So just before you start drawing, how big is this

room?  Just estimate.  You don't have to be exact.

A    Maybe from the edge of this table to like that podium, maybe.

Q    Okay.  To the edge of -- that would be one, two, three, six, seven feet?

A    Yeah.  Something like that.  Yes.

Q    Okay.  So if you could just draw a box for me about the size or the proportions you think the room was.  Okay.  Now, the -- let's put the hallway at the bottom edge of that paper.  So just imagine.  You don't have to actually draw it.

A    Okay.

Q    So where's the door from the hallway?  Is it in the middle of that wall or is it on the other side?

A    It's on like one side.

Q    Okay.  So you can draw the door there just so I can mark it.

A    (Witness complies.)

Q    Okay.  Now where's the bed located?

A    In the middle of the floor.  So it's like -- it's like you walk in and it's a corner.

Q    You can go ahead and draw that.

A    So like it's the -- a corner ends, it's like the bed and the wall right up front.

Q    Okay.  So that's -- looking at the paper in the

bottom right-hand corner, you've drawn a box.  That's like -- what is that, a closet, or something like that?

A    This right here?

Q    Yes.

A    This would be a bathroom.

Q    Okay.  So that's a separate bathroom?

A    Yeah.

Q    A bathroom inside?

A    Yeah, it's a bathroom in the --

Q    Okay.  Where's the door of the bathroom at?

A    So it's like right here.  Like right when you walk in, it's like right in the --

Q    You're right in the door there?

A    Uh-huh.

Q    Perfect.  Thank you.

     Okay.  Was there a chair, or anything else in the room?

A    It's a bedside table was in there on the other side of the bed.

Q    Okay.  And could you -- could you mark where Mr. Johnson was standing when you went in the room?

A    He was standing next to the window.

Q    Just put an X and then -- okay.  Perfect.

     Now, could you mark where -- so you said you went in first, right?

CROSS-EXAMINATION OF MS. FLIPPEN BY MR. CAMDEN    42

A    I went in first.

Q    Okay.  And then Nurse Leedle came in behind you?

A    Uh-huh.

Q    Okay.  Could you mark where she was standing when the assault happened and he grabbed her?

A    So, if I was --

Q    Put a letter where she was standing.

A    Okay.  So, if I was standing right here, and I'll put an F, -

Q    Okay.

A    - she went around me.  And she was standing right here in front of him.

Q    Okay.  Got it.

Did you hear what she said to Mr. Johnson?

THE COURT:  Do you have anymore diagram questions?

BY MR. CAMDEN:

Q    So is there any more furniture in the room, a closet, a lamp?

A    I mean, it's a -- a closet, but it's next to the bathroom.  It's not really -

Q    Okay.

A    - I mean, it's not sticking out.  Just the locker.

Q    And was he actually -- was he sitting on the bed when you came in or was he standing?

A     No, he was standing.  It's a bedside table that was sitting next to him.  So he was standing at the table.

Q     All right.  Now, you mentioned the --

THE COURT:  Hold on.  So show the diagram to the government.

MR. CAMDEN:  I move to admit Defense Exhibit A.

THE COURT:  All right.

Any objection?

MS. MICHALAK:  No objection, Your Honor.

THE COURT:  Okay.

(Defendant's Exhibit A is received.)

BY MR. CAMDEN:

Q     So when Nurse Leedle came in and you said she went around you –

A     Uh-huh.

Q     – towards Mr. Johnson, correct?

A     Yes.

Q     Okay.  About at that point, did you hear what she said to Mr. Johnson?

A     I don't recall her saying -- I mean, I don't recall her saying anything.  I recall, you know, myself saying, you know, you can't eat.  You're not supposed to eat.  You know if you eat you can't go home.

Q     Okay.  Was he scheduled for an MRI, or do you remember what he was scheduled for?

CROSS-EXAMINATION OF MS. FLIPPEN BY MR. CAMDEN    44

A    He was scheduled for, I think it was, a CT.  I'm not -- I mean, I can't remember.

Q    A CT meaning –

A    Like a --

Q    – a brain scan?

A    A brain scan, or something like that.

Q    Okay.  So you did mention removing the tray.  And it was important because there were utensils on there and a metal heating tray, right?  But you never saw Mr. Johnson actually reach for the tray to use it aggressively, right?

A    No.  But because of him where he was, and the table was right there.

Q    So it was a precaution, right?

A    So it was pretty much me being precautious that he was going to probably --

Q    And you never saw him use a closed fist on Nurse Leedle, did you?

A    No.

Q    So he -- describe what he did.  Did he -- he grabbed her around the arms, you said?

A    Yeah.  He kind of like bear hugged her.

Q    Bear hug?

A    Like grabbed her around the arms right there.

Q    And then he moved her up the (inaudible), or how did that happen?

CROSS-EXAMINATION OF MS. FLIPPEN BY MR. CAMDEN   45

A    He didn't really move her.  I mean, they were facing each other.  So he just pretty much pushed her back.  It's a wall that sits right there.  So he pretty much just pushed her back.

Q    Okay.  So did you ever see his hands or any part of his body touch her head?

A    Like I said, I left out of the room.  I grabbed the tray and I kind of left out the room.

Q    But at the time, based on what you saw, you never saw him actually --

A    I never saw him with his hands on her head.  I just saw the bear hug, him push her up against the wall.

Q    Okay.

A    And I kind of walked out.

Q    Got it.

          MR. CAMDEN:  Can I have one second, Your Honor?

          THE COURT:  Uh-huh.

          MR. CAMDEN:  Okay.  No further questions, Your Honor.

          THE COURT:  All right.

          Any redirect?

          MS. MICHALAK:  No redirect, Your Honor.

          THE COURT:  All right.

          All right, ma'am, you may step down.

          Is there any reason she can't be excused from

the government?

MS. MICHALAK:  No, Your Honor.

MR. CAMDEN:  No, Your Honor.

THE COURT:  All right.

You may be excused, ma'am.  So you're free to leave, or you may stay in the courtroom.

MS. FLIPPEN:  Okay.

**WITNESS STOOD ASIDE**

THE COURT:  All right, government, call your next witness.

MR. GARNETT:  Judge, we call Sergeant Jeffrey Almond.

THE COURT:  All right.

THE CLERK:  Do you affirm under penalty of perjury that the testimony you're about to give, in this case, before this Court, shall be the truth, the whole truth, and nothing but the truth?

SERGEANT ALMOND:  I do.

THE COURT:  You may proceed.

Whereupon, **Sergeant Jeffrey Almond**, having been duly sworn in, testifies as follows:

**DIRECT EXAMINATION**

BY MR. GARNETT:

Q   Good afternoon, sergeant.  Could you please introduce yourself to the Court, and spell your first and last name

for the record.

A    Yes.  My name is Sergeant Jeffrey L. Almond.
J-E-F-F-R-E-Y.  Last name Almond, A-L-M-O-N-D.

Q    Okay.  How are you employed, sir?

A    I'm employed as a sergeant at the Veterans Affairs
Federal Police Department.

Q    How long have you been employed with the VA police?

A    Since '05.

Q    And where exactly do you work at the VA?

A    At Richmond McGuire Federal Hospital.

Q    Okay.  You just said the McGuire Medical Center?

A    Yes, sir.

Q    Okay.  And the McGuire Medical Center, you said
that's located in Richmond, right?

A    Yes, sir.

Q    Okay.  Is that a federal facility?

A    Yes, it is, sir.

        MR. CAMDEN:  Objection.  Foundation, personal
knowledge, confrontation clause.

        MR. GARNETT:  I don't -- I fail to see how the
confrontation clause is at all implicated, Your Honor.  He
said he works for McGuire Medical Center.  He would be
aware of the type of entity he works for.

        THE COURT:  Overruled.

        MR. GARNETT:  Okay.

BY MR. GARNETT:

Q    Is the McGuire Medical Center located -- I'm sorry, administered by the Department of Veterans Affairs?

         MR. CAMDEN:  Same objection, Your Honor. Foundation, hearsay, confrontation clause.

         THE COURT:  Overruled.

BY MR. GARNETT:

Q    And is the McGuire Medical Center, located in Richmond, is that within the Eastern District of Virginia?

A    It is.

Q    Okay.  Is that within the jurisdiction of this Court?

A    It is.

Q    Sergeant, does the McGuire Medical Center have broadcast codes that alert staff and law enforcement to, let's say, certain emergencies that take place in the hospital?

A    Yes, sir.

Q    Okay.  Does one of those broadcast codes pertain to disorderly patients?

A    Yes, sir.

Q    Okay.  When that particular code is broadcast pertaining to disorderly patients, do both law enforcement and medical staff respond?

A    We do.

Q    Were you on duty on January 30th of 2017?

A    I was.

Q    And did you hear sometime shortly after noon one of those disorderly patient broadcasts?

A    I did, sir.

Q    Okay.  And did you respond to the specific area that was mentioned in that broadcast?

A    Yes, sir.  That was Ward 4C.

Q    Okay.  Does that broadcast direct you to a specific room, a room on Ward 4C?

A    Yes, sir.

Q    What room were --

A    4C-123.

Q    I'm sorry I interrupted you.  Could you just say that again, for the record.

A    4C-123.

Q    Okay.  And what is Room 4C-123?  Is this a patient's room?

A    Yes, sir.

Q    Okay.  And do you know what patient was in -- I should say was there a patient in the room that day?

A    Yes, sir.

Q    Okay.  What patient was that?

A    Cornelius Johnson, sir.

Q    Okay.  And when you arrived at Room 4C-123, had medical -- let me back up there.

You say Cornelius Johnson was the patient in that room.  How do you know Cornelius Johnson was the patient in that room?

A    The name was on the door.

Q    Did you respond -- I'm sorry.  When you arrived at Room 4C-123, this is shortly after noon, approximately?

A    Right around 12:45, approximately.  Yes, sir.

Q    Okay.  And had medical personnel already arrived by the time you showed up?

A    Yes, sir.

Q    Were you the first law enforcement officer to show up that day?

A    Pretty much, sir.

Q    And when you arrived, did you look inside the room?

A    I was standing at the doorway right into the little corridor there.  Yes, sir.  I could not get in the room because of medical staff.

Q    And were medical personnel talking to the patient in the room?

A    Yes, sir, they were.

Q    Okay.  Did you overhear anything that those medical personnel asked the defendant regarding, let's just say, the disorderly conduct broadcast you've just received?

A    I did.

Q    What did they say?

A    I overheard one of the medical staff asking Mr. Johnson why he had hit the nurse.  He say, "She would not let me leave.  I wanted to get food."

Q    Okay.  Have you addressed the patient in the room before that?

A    No, sir.

Q    Okay.  Did you observe any law enforcement officer talk to the patient before that?

A    No, sir.

MR. GARNETT:  Thank you, sir.  That's all the questions I have for right now.  Please answer any questions that Mr. Camden or Ms. Koenig or the Court may have for you.

SERGEANT ALMOND:  No problem.

THE COURT:  Any cross-examination?

MR. CAMDEN:  Real briefly, Your Honor.

**CROSS-EXAMINATION**

BY MR. CAMDEN:

Q    Did you hear the question that was asked of Mr. Johnson that resulted in him saying that he -- it was because she wouldn't let him leave?  So the question resulted in him --

MR. GARNETT:  Your Honor, I don't think that was the officer's testimony that she wouldn't let him leave, was it?

THE COURT:  I think what he's asking is did the officer hear the question that prompted the response that she didn't let him leave.

A    From the doctor, yes.  Yes, sir.

Q    Okay.  Did the doctor use the word "hit" or "push" or "shove," or do you remember exactly what word was used?

A    If I recall, he asked her why he hit her.

Q    Okay.  And at the time, where was Mr. Johnson when he made this statement?

A    He was sitting on the bed.

Q    Okay.  And the room -- how many people were in the room at that time?

A    Several.  I cannot give a number.  Several.

Q    Enough that it -- you couldn't get in the room, right, comfortably?

A    You have to understand something about the Dr. Atlas, sir.  It's a medical event until it's turned over to law enforcement if they can't handle it.  We're there as a backup if needed.  Once they turn it over to us, if they can't get it under control, we will get it under control, we hand it back over to medical staff.

Q    Got it.

A    At that moment in time, we were just there.  We were standing in the doorway in case they needed us.  The medical staff already had the situation pretty much under

control, but we were standing there just in case.

Q    Got it.  Okay.  And you never saw, or directly observed, Mr. Johnson do anything violent?

A    No, sir.

Q    Okay.  And there was a discussion at some point between you and the medical staff about whether to arrest him?

MR. GARNETT:  Objection, Your Honor.  This is outside the scope.

THE COURT:  Say that question again.  I'm sorry.

MR. CAMDEN:  There was a discussion between him and the medical staff about whether to arrest Mr. Johnson.  It's in the government's briefing.  It's Document 5, Your Honor.

THE COURT:  I know.  What's the relevance?

MR. CAMDEN:  The relevance is the power to arrest at this point.

MR. GARNETT:  I'm not sure the arrest is even relevant here, Your Honor.  We're here on a charge that was filed.  An arrest wasn't required for a simple assault charge to be filed by the VA.

THE COURT:  All right.  That objection's sustained.

MR. CAMDEN:  Understood.

BY MR. CAMDEN:

Q    Well, I guess I'll preview this question then.  Don't answer yet until the government has a chance to object.

At a certain point, you directed Officer Gibbs to contact the U.S. Attorney's Office to decide what to do in the case, right?

A    I don't recall.  It's usually protocol that we contact the U.S. Attorney in any event that would result in this manner of situation -- this type of situation.

Q    Right.  And they give you directions about whether to file charges or not file -- charges to file sometimes?

A    Usually.  Yes, sir.

Q    Okay.

MR. CAMDEN:  No other questions then, Your Honor.

THE COURT:  All right.

Any redirect?

MR. GARNETT:  Just very briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MR. GARNETT:

Q    When you were standing in the door of Room 4C-123 observing medical staff talking to Mr. Johnson, did you see anyone threaten the defendant or hear anyone threaten the defendant?

A    No, sir.

Q    Okay.

MR. GARNETT:  Nothing else, Your Honor.

THE COURT:  All right.

All right, officer, you may step down.

SERGEANT ALMOND:  Thank you.

THE COURT:  Is there any reason that he can't be excused?

MR. GARNETT:  Not for the government, Your Honor.

MR. CAMDEN:  No, Your Honor.

THE COURT:  All right.

You may step down.  Thank you.

**WITNESS STOOD ASIDE**

THE COURT:  All right, government, call your next witness.

MR. GARNETT:  Your Honor, the government rests.

THE COURT:  All right.

Mr. Camden?

MR. CAMDEN:  If I could speak with Mr. Johnson for a second, Your Honor?

THE COURT:  Sure.

MR. CAMDEN:  Defense rests.  No evidence, Your Honor.

THE COURT:  All right.

I'll hear argument.

MR. GARNETT:  Your Honor, the defendant is

charged in a criminal information with simple assault.  As Your Honor knows, those charges stem from the defendant's alleged assault of Nurse Beverly Leedle on January 30th, 2017, at the VA McGuire Medical Center in Richmond, Virginia.

Your Honor, simple assault, in violation of 18, United States Code, Section 113(a)(5) has two elements the government is required to prove beyond a reasonable doubt. And the first is that the assault occurred within this Court's jurisdiction.  Your Honor, there's been testimony here from Sergeant Almond that this assault occurred on Department of Veterans Affairs property, which is located at the McGuire Medical Center.  It is located in Richmond, Virginia, which is within the Eastern District of Virginia.  And as Your Honor is of course aware, is within the special territorial jurisdiction of this Court.

Your Honor, second, the United States is required to prove beyond a reasonable doubt that the defendant did in fact assault Nurse Beverly Leedle on January 30th as alleged.

Your Honor, the Court heard the testimony of Nurse Leedle.  And she explained to the Court that when she tried to retrieve a food tray from the defendant in his room, he grabbed her about the waist.  He moved her violently against the wall such that her head slammed into

the wall, as she said, three to five times.  She described the symptoms she suffered afterwards, Your Honor, would certainly go to both the fact that her head did impact the wall in the force with which the defendant pushed her into the wall.

You heard the testimony of Nurse Flippen, Judge. Nurse Flippen explained that when she entered the defendant's room to explain that he couldn't have the tray, she watched as Nurse Leedle attempted to retrieve the tray and was, as Nurse Leedle had said, grabbed about the waist and moved towards the wall.  Nurse Flippen didn't see what happened after that, Your Honor, for the simple reason that she knew what the defendant was doing, and she wanted to get a tray with sharp utensils that he could use as a weapon away from him before he could use that against her colleague, who he had already seized and was starting to push into a wall.

Finally, Your Honor, you heard the testimony of Sergeant Almond of the VA police explain that he responded to a report of a disorderly patient.  He arrived at Room 4C-123, observed the defendant -- I'm sorry, observed the patient inside speaking to medical staff.  He said that the medical staff had the situation in control.  It was not a threatening situation that would threaten the defendant.

They asked the defendant why did you hit the nurse? Why did you hit Nurse Leedle? The defendant said because she tried to -- or she wouldn't let me have the food, or something to that effect. It was a candid admission that he had in fact assaulted her, and that his reason for doing so was simply because he wanted a food tray.

Your Honor, the evidence is clear -- the evidence is overwhelming that on January 30th, 2017, the defendant did in fact commit simple assault by grabbing Nurse Leedle, slamming her and her head into a wall numerous times at the VA Medical Center in Richmond. We would ask you to return a verdict of guilty, Your Honor.

Thank you.

THE COURT: All right.

Mr. Camden.

MR. CAMDEN: Your Honor, I thinks it's important here to talk about the elements. The element is not simply assault. 11 -- or 113(a)(5) lists simple assault. And really, that is a reference to the common law of assault. The common law of assault -- so the elements of this are actually an intentional -- that the defendant committed an intentional offensive touching. And that's -- I've got a case for that. *United States v. Payne*, which is 2017 U.S. District Court, Lexis, 30066. It's a

District of Maryland case, just from this year, 2017, surveying all -- a lot of cases on assault.

THE COURT:  I've read it before.  And I've read it before coming on the Bench.

MR. CAMDEN:  Right.

So the government has to prove beyond a reasonable doubt the intentional and offensive touching, not simply any intent of any touching.  But the indictment in this -- or the information, I'm sorry, in this case is the intentional striking of Nurse Leedle's head against the wall.  And the government can't expand beyond that.

The -- "When the government or the court broadens the possible bases for conviction beyond those included in the indictment, a constructive amendment occurs which is per se reversible error."  That's *United States v. Ellis*, 121 F.3d 908, a Fourth Circuit case from 1997.

So there are a couple of issues that really need to be parsed out in this case, Your Honor.  The first is not simply whether he intentionally touched Nurse Leedle, but whether he intentionally caused her head to hit the wall.  I don't believe there's sufficient evidence -- I'd proffer to the Court that there is not sufficient evidence in this case that that happened.

If you look at the actual diagram, and where

he's standing, he's standing on the far side of the bed. Between him and the door are the bed and two nurses. Nurse Leedle didn't stop where Nurse Flippen stops. And Nurse Flippen said she's the first one to come in and she stopped, and Nurse Leedle came around her and confronted Mr. Johnson directly, and that he did not touch her head. He didn't grab her head. There's no evidence in the record at all that he actually touched her head. It's that he gave her a "bear hug," was how Nurse Flippen called it, and tried to move her.

Then he tells the officers after -- or he tells the medical staff, I guess within hearing of the officer, that "Why did you do it?"

"It's because they wouldn't let me leave."

THE COURT: Why did he do what?

MR. CAMDEN: Well, they -- they asked, "Hit the nurse." But there's no evidence that an actual striking happened. The government didn't charge this on a striking theory. And the only evidence we have of the contact is the -- that he grabbed her and shoved her and moved her.

And I think (inaudible) hit is broad enough to -- if you're asked that question, and you know what happened, that they're really asking for why it happened. And he says, "Because they wouldn't let me leave."

So I think that that -- that element is missing,

Your Honor, that the intentional -- if the government had charged this more broadly, if they'd charged other aspects of the assault, then perhaps we'd have the intent to go along with it.  But there's no evidence in the record that he wanted or even intended for Nurse Leedle's head to hit the wall when he grabbed her and moved her out of the way.

The second issue I think that really needs to get down is what -- what justification did the medical staff have for confining Mr. Johnson to his room.  So Nurse Flippen testified that she told him, "If you eat, you can't have the procedure and then you can't go home."

She said he'd been eager for the last -- he's restless, he's hungry and he wants to go home.  You can see him right now.  She said he's about the same weight. This is not a well-fed man, Your Honor.  And the morning -- the breakfast had been at 6:30.  So it's about 12:45, the officer testified.  So six hours have gone by with no food.

And the real question though is what right did the nurses have to stop him?  If you imagine a similar situation where someone's coming in for an outpatient procedure where they're not allowed to eat anything, the nurse is walking through the parking lot and sees them with a granola bar in their car, the nurse doesn't have the authority to keep them in the car until they give back

the food.  What happens is if he eats?  They reschedule the surgery or they reschedule the procedure.  It's up to him.  They've got to convince him not to do it.  But this isn't something that can be backed up by force or with -- with detention, which is what happened in this case.

If you look at the Cal -- or the Virginia cases, Your Honor, *Breland v. Commonwealth*, 2012 Va. App. Lexis 307 is a case where a person simply blocked another person from exiting a bathroom.  There was one exit and he blocked him so he could question him.  And he was guilty of the Virginia crime of abduction.  Now, we're not saying that the nurses committed these crimes or were guilty or should be charged, or anything like that.  But the simple fact is that a person is entitled to use a reasonable amount of force to escape, especially when a person detaining them has no lawful authority to do that.  And the cases for that go back over 100 years, Your Honor.

*John Bad Elk v. United States* is the Supreme case -- Court case on point.  It's 177 U.S. 529.

There is an even more recent Eastern District of Virginia case, *United States v. Moore*.  It's 332 F.Supp 919.  It's Eastern District of Virginia, 1971.  Same charge, 113(a)(5), simple assault where the defendant was the wife of a military officer member, and the military police arrived at the house to arrest him without a

warrant for a misdemeanor that was not committed in their presence. So the Court concluded they had no lawful authority to commit -- to perform this arrest.

And the wife actually grabbed one of their arms and tried to pull it off the officer. And she was charged with simple assault, offensive touching. And in the written opinion, the Court said that this is privileged use of force. You're allowed to use a reasonable amount of force to resist an unlawful detention and arrest, and found her not guilty.

So I think those questions have to be answered. What authority did the nurses have, or the medical staff have, to confine him to his room to block his exit from the room? And did the amount of force he used, was it reasonable in order to try to get out?

We don't have -- the nurse testified he didn't use any weapons, he didn't go for the tray. It was a bear hug in trying to move Nurse Leedle out of the way, and the consequence of which was that her head was struck against the wall. But it certainly was no open fist. There was no kicking. There was no biting. There's no evidence of any other kind of act or actual intent to -- to damage somebody as opposed to the intent to get out of that room.

And even if, Your Honor, the preponderance of the evidence were the standard, then maybe, you know, this

would be a closer case. But when there is some evidence in the record of self-defense, then the government bears the burden to prove lack of -- or to disprove self-defense beyond a reasonable doubt. Cases I've got for that are *United States v. Ellinger.* It's a Sixth -- the only Fourth Circuit case is --

THE COURT: What was the evidence of self-defense in this case?

MR. CAMDEN: Well, Your Honor, the -- the diagram that you see is that they were blocking his exit from the room. They presented no evidence that he -- they had the right to confine him.

THE COURT: But what was the evidence of self-defense? What was the evidence that he was trying to leave the room and they were restraining? What was the evidence of self-defense? I just don't remember that.

MR. CAMDEN: Sure. So, Your Honor, one -- after he was arrested and the medical staff asked him why he had hit the nurse, with the broad meaning of that, he told them that, "They wouldn't let me leave." And that was testified to by the officer.

THE COURT: I thought he said "They wouldn't let me eat."

MR. GARNETT: Yeah.

MR. CAMDEN: This -- I believe -- and we can get

a transcript if it's necessary, but it wasn't -- in the reports that we have that the government provided, I heard "leave." In the reports we got in the government's own briefing, Document 5 at Page 2 also said "leave." She wouldn't let me leave. So --

THE COURT: I did write "leave" down (inaudible).

MR. CAMDEN: Okay.

In addition, Nurse Flippen was there telling him "If you eat, you can't go home." So he's got affirmative statements from them telling him.

And you've got their positioning in the room. You've got the bathroom and the bed blocking the door, so -- and both of them are positioned -- first, Nurse Flippen stands between him and the door, and then Nurse Leedle comes around him onto his side of the bed and confronts him. So, this is obviously a situation where his -- his liberty is being restrained, and certainly no more than the Virginia courts have found is sufficient to show an unlawful detention if you're blocking the exit, standing in an exit to prevent somebody from leaving. So it's not simply the circumstances, it's also the statements that were made to him that he wouldn't be able to go home.

Either the -- the case I do have for the --

regarding burden of persuasion, the Fourth Circuit -- I can only find unpublished cases.  But they do cite to a published Eighth Circuit case.

So, the Fourth Circuit case is *United States v. Bellinger*.  It's 652, Federal Appendix, 143.  And that's an unpublished.  But it's from 2016.  Very recent.  And that cites and relies on an Eighth Circuit case, *United States v. Milk*.  It's 447 F.3d 593 at 598.  And that's a 2006 case in the Eighth Circuit.

And it says, quote, Although a federal defendant bears the burden of production on the issue of self-defense, once that burden is met, the government must prove beyond a reasonable doubt that the defendant did not act in self-defense.

And that, likewise, was an assault case.

So Your Honor, under a different standard, under a preponderance if we're just eyeballing this, it might come out a different way.  But this is a heavy burden beyond a reasonable doubt that it wasn't self-defense, given the ambiguity of the evidence, given the statements that were made to him about how he couldn't leave, given the diagram where we have showing that they're blocking his exit, given the -- the lack of any sort of striking, wounding, use of weapons or any sort of violent force that would be obviously intended to cause injury.

We have a bear hug in trying to move the nurse by a man who you can see his physical frame.  He's not a big man.  He's not a tall man.  He's not towering over the nurses.  He's not capable of using the kind of intimidating force that might lead to an intent to injure.

The other issue -- and I know the Court -- I just -- I have to mention it because I know the Court overruled the objection, but regarding jurisdiction.  The government does have the burden to prove beyond a reasonable doubt that this is within the special maritime jurisdiction of the United States.  The officer testified that it was a federal facility.  This is all really based on the property clause of the Constitution.  It has to be property that is owned or controlled by the United States and by the federal government.

And there's nothing in here from his personal knowledge, at least, that he knows that this property is -- falls within the property clause of the Constitution, meaning it's owned or controlled by the United States government.  So I would ask for the judgment of acquittal on that grounds as well.

If the Court has any particular questions, I'm happy to answer them.  I would request -- Rule 23 says I have to request this, so I'm making a request under Federal Rule of Criminal Procedure 23(c).  It says, "If a

party requests before the finding of guilty or not guilty, the court must state its specific findings of fact in open court or in a written decision or opinion."

So I would request those findings of fact to be on the record, Your Honor.

THE COURT:  Any response?

MR. GARNETT:  Briefly, Your Honor.

Your Honor, I believe the evidence is clear that the defendant grabbed Nurse Leedle around the waist, swung her into the wall such that her head slammed into the wall numerous times.  That's simple assault, and simple assault as charged in a criminal information, and the defendant's guilty of that.

The defendant's only argument essentially is to introduce facts that are not into evidence or argue, frankly, irrelevant points about whether the VA's policy on feeding should be revisited.

The burden of production on self-defense, there's really -- facts are being created here, Your Honor, that when a nurse goes to take a food tray out of someone's room, suddenly that is transposed into forceable detention of a patient who's there for treatment.  There's been no testimony, no evidence that anyone ever laid hands on the defendant.  That anyone obstructed, deliberately obstructed, his path from the room.  A nurse walked in to

retrieve a food tray, Your Honor.  The defendant grabbed her and swung her into the wall such that her head slammed into the wall repeatedly.  It's simple assault, and we'd ask Your Honor to return a verdict of guilty.

Thank you.

THE COURT:  All right.

If you'd stand up, Mr. Johnson.

All right, Mr. Johnson, the Court has considered the evidence adduced this afternoon, and the argument of counsel.  And based on that, the government -- the Court finds beyond a reasonable doubt that the government has proved that you have violated Title 18, United States Code, Section 113(a)(5), and so I find you guilty of that.

I find you guilty for the following reasons:  I credit the testimony of Ms. Leedle.  And I find that her testimony is credible that she went into your room to remove a tray, and that while she was attempting to remove that tray that you grabbed her and slammed her into the wall where her head struck the wall between three and five times.

I also credit the testimony of Ms. Flippen.  And I find her testimony credible that she testified that you were there.  And as part of your stay at the hospital, you were there for a procedure.  In order to have whatever the particular procedure was, that you weren't to have any

food.  They witnessed you take a tray that had food, I believe, during lunchtime.  And in an attempt to retrieve that tray, Ms. Flippen saw you grab Ms. Leedle, I believe is the way her name is pronounced, without permission and based on that she removed the tray.

There's obviously some code that went out for extra assistance from medical personnel, as well as the police.  And they arrived, and when you were questioned about why you hit Ms. Leedle, you indicated you did that, and you admitted that you did that because they wouldn't let you leave.  So based on that, I find you guilty.

I also credit the testimony of the police officer who established that McGuire is a federal facility within the Eastern District of Virginia.

So, Mr. Camden, would you like an expedited presentence report or a full presentence report?

MR. CAMDEN:  I -- I think a full would be better.  We'll be able to get together a lot of the -- the evidence, I think.

THE COURT:  Okay.  All right.  We'll order a full presentence report.

Let's set a date for a sentencing.

MS. KOENIG:  Your Honor, is it okay if Mr. Johnson sits down now?

THE COURT:  Yes.  Yes.

THE CLERK:  Tuesday, October 17th at 1:30.

MR. GARNETT:  I have a sentencing in front of Judge Lauck at 2:00 p.m.

THE CLERK:  The Court is available in the morning at 11:30.

MR. GARNETT:  That's fine for the government, Your Honor.

MS. MICHALAK:  That's fine for the government.

MR. CAMDEN:  That's fine for us.

THE COURT:  All right.

All right.  Okay, the government's position as to bond?

MR. GARNETT:  Your Honor, I don't oppose the defendant being out under --

THE COURT:  What does the statute say?

MR. GARNETT:  Your Honor, actually, the statute says the defendant -- I believe the burden shifts to the defendant to show that he is in fact not a risk of flight or a danger to the community.  And I would simply proffer that it's the defendant's burden, and we can respond to that.

THE COURT:  All right.

Mr. Camden.

MR. CAMDEN:  Yes, Your Honor.  I'm looking at 31 -- 18, U.S.C., 3143.  This has come up once before.  And

it's kind of hard to make heads or tails of.  It is -- so, it says except as provided in paragraph (2), after a finding of guilty, the Court shall order for the defendant -- depending if you -- it says other -- per conviction of an offense, other than a person for whom the applicable guideline promulgated pursuant to the guideline statute, does not recommend a term of imprisonment.

And in this case, the lowest guideline range is zero to six months.  And that's the range we actually have that's the statutory maximum in this case.  So this is essentially identical to somebody who is looking at a guideline range of zero to six months.  So I'm not sure that 3143 covers it.

In any case, Your Honor, he -- he has been attending court.  He's come to every court appearance he's had.  I know there was a writ of habeas.  I've prosecuted -- I'm not even going to try to pronounce it. He had probation in the previous case and they attempted to revoke, or they filed a petition to revoke, but it's only based on the conduct in this same case.  So he was released a few days ago.

We actually, my co-counsel and I, have visited him at home with his mother who's here in court to support him.  He lives actually it's just across the street from the VA Medical Center.  And we heard from Nurse Flippen

just today, Your Honor, that after this incident happened, he stayed in the hospital for another seven days, or a week or so, with no further incidents.

I think this is a one-time -- it's a pretty isolated incident.  His conduct since then, and this was back in January, has been good.  He's kept in touch with us, he's appeared in court, and I think that shows that he's not a risk of -- of danger or flight to the community.

THE COURT:  All right.

Is the government not recommending a sentence imprisonment?

MR. GARNETT:  Your Honor, I anticipate the government will be recommending a sentence of imprisonment.

THE COURT:  All right.

Stand up where you are, Mr. Johnson.

All right, Mr. Johnson, having found you guilty of this offense, I have to turn to the Bail Reform Act. And the Bail Reform Act instructs that if you've been found guilty of a crime of violence, and this assault is a crime that is a crime of violence pursuant to the case of *United States v. King*, and that the government is recommending a sentence of imprisonment, and there's not a substantial likelihood or motion of acquittal in a new

trial, and I don't find by clear and convincing evidence that you're not likely to flee or pose a danger, and I find that based on the evidence that I've heard there is at least a possibility that you could be a danger to the community, especially living across the street from the place where this incident took place, so I'm going to remand you to the custody of the United States Marshal pending your sentencing hearing in October.

All right, so he's in your custody, Marshal.

So here is a couple of things.  The one exhibit that didn't come in, I'm handing back.  I'm handing back the document as well.

Anything else from the government?

MR. GARNETT:  No, Your Honor.

THE COURT:  Anything else from the defense?

MR. CAMDEN:  No, Your Honor.

THE COURT:  We'll stand in recess.

REPORTER'S CERTIFICATE

I, Krista Liscio Harding, OCR, RMR, Notary Public in and for the Commonwealth of Virginia at large, and whose commission expires March 31, 2020, Notary Registration Number 149462, do hereby certify that the pages contained herein accurately reflect the recording transcribed by me, to the best of my ability, in the above-styled action.

Given under my hand this 21st day of October, 2017.

_____
Krista Liscio Harding, RMR
Official Court Reporter